**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION**

KATHERINE R. HENSON,

        Plaintiff,

                                  CASE NO.  3:04cv85-RV/MD

vs.

UNITED STATES OF AMERICA,

        Defendant.

_____/

## ORDER AND MEMORANDUM OPINION

        The plaintiff, Katherine R. Henson, filed this medical negligence case against the United States pursuant to the Federal Tort Claims Act [28 U.S.C. § 2674]. The case was tried to the court, without a jury, on April 24 and 25, 2007. Having reviewed and considered all of the evidence, and the parties' pre-trial submissions and arguments, and being otherwise fully advised, I hereby make the following findings of fact and conclusions of law as required by Rule 52 of the Federal Rules of Civil Procedure.

**I.    FINDINGS OF FACT**

        Henson joined the United States Navy in 1986, when she was 17 years old and immediately after graduating from high school. Two years later, in 1988, she got married and started a family. She and her husband had two children together, and they divorced in 1993. During her military career, Henson struggled with serious mental health problems and major depression. She was diagnosed with bipolar (manic depressive) disorder, attention deficit disorder, and post-traumatic stress disorder. She took medication for her condition, including lithium. Henson testified that her psychiatric problems caused her to have several "breakdowns,"

one of which was so severe that she was confined to a mental ward. After she was released from her hospitalization, in or about January 1995, Henson was separated from the Navy with a medical disability retirement. She held the rank of Petty Officer, Second Class, at the time of her separation from the military. Henson was awarded custody of the two children that she had with her ex-husband, and she later had a third child in 2000.

In or about early 2001, Henson stopped nursing her youngest child. During a self examination while in the shower, she noticed a lump in her right breast and thought it might be related to an infection from a clogged milk duct that she had while breast-feeding. She was then 33 years old. She went to the 96th Medical Group Family Practice Clinic ("FPC") at Eglin Air Force Base ("Eglin") for a breast exam. Henson went to FPC on two occasions for this breast complaint, and these two visits form the basis of this lawsuit.

First, on March 6, 2001, Henson reported with a complaint of "lump in right breast," and she was seen by Dr. Thomas E. Applegate. According to the intake form that was filled out when she first presented, Henson noticed the lump a few days prior, on March 2, 2001.[1] It was noted that her mother had breast cancer at age 40. Henson stated that she had a mammogram several years before, but the results were lost.[2] Dr. Applegate noted "pendulous breasts" and found tenderness in the right breast but "no lumps or cysts" and "no adenopathy" (enlargement of the lymph nodes). A drawn diagram in the clinic note locates the tender area in the 12 o'clock position of the right breast. Dr. Applegate recognized that Henson had a

---

[1]Henson testified at trial that she felt the lump about a month before the March 6, 2001 visit.

[2]Although the mammogram results were said to be lost, according to her medical records from the Pensacola Veterans Affairs Clinic, dated June 12, 2002, this earlier mammogram was "reportedly normal."

Case No. 3:04cv85/RV/MD

positive family history, but he felt that, at age 33, she had a "low-probability for cancer." He indicated that "FCBD" (fibrocystic breast disease) was a concurrent consideration for her "mastalgia" (breast pain). Henson testified that she told Dr. Applegate that she thought it was a residual breast-feeding problem and not breast cancer. Ultimately, because he could not feel a mass, and because of the large size of her breasts, Dr. Applegate opined that her pain was most likely due to a ligament stretch or strain. He recommended that she wear a better support garment. He also explained to her that oftentimes breast pain is related to the menstrual period (which Henson was expecting that week), and that it will resolve itself when the cycle finishes. Dr. Applegate thus concluded his examination by noting that he intended to order an ultrasound if the breast pain was still present in two weeks.[3]

Dr. Applegate testified at deposition that he specifically recalled talking with Henson about her family history of breast cancer and advising that it was "important that she follow-up on that." But, she did not return in two weeks as directed. In fact, she did not return to FPC until April 30, 2001, nearly eight weeks later, when she was seen by Dr. Robert D. Shutt. Dr. Schutt reviewed the March 6th treatment note from Dr. Applegate and was aware of her prior visit. Henson informed Dr. Shutt that the "lump is now harder" (although it was "unchanged in size"), and she showed no improvement with the better support garment. Dr. Shutt reiterated the mother's history of breast cancer and indicated that Henson had

---

[3]It was argued at trial --- and noted in the depositions filed with the court --- that Henson did not specifically complain to Dr. Applegate about breast pain. Thus, Henson impliedly suggests that it is of no consequence that Dr. Applegate intended to refer her to an ultrasound if the pain was present in two weeks because there was no pain in the first place. However, Dr. Applegate explained that, in his mind, the tenderness found in the right breast qualified as pain because "tender means that it hurts when you push on it." Henson testified at trial that she "winced" when he applied pressure to her right breast. That is the reason Dr. Applegate said that he intended to refer Henson to an ultrasound if the pain (*i.e.*, the tenderness) was still present in two weeks.

noticed the mass two to three months ago. He further noted that Henson had stopped breast-feeding several months before and had been doing fairly regular self breast examinations, but she had not found a similar lump any time previously. Dr. Shutt reported during his examination that there was a "firm area approximately 12 o'clock at the top of the right breast, but there is no clear dominant mass noted." Nonetheless, he indicated "NO CLEAR MASS IS NOTED TO MY EXAMINATION BUT WILL OBTAIN ULTRASOUND TO FURTHER EVALUATE." (Capitals in original). Dr. Shutt testified at deposition that this was because "I didn't feel a mass, but I still had some concern about it, so I was going to further investigate it." He ordered the ultrasound --- consistent with the treatment plan indicated by Dr. Applegate --- and described plans for referral to surgery if any abnormalities were found. If no abnormalities were found, Dr. Shutt indicated that "the results will be discussed with the patient and a decision will be made on where to go from here." Dr. Shutt testified that even if the ultrasound was normal, he would have probably sent Henson for a mammogram or surgical consultation. The ultrasound was ordered to be conducted within two weeks, and Henson was told to "follow-up in the meantime for new or worsening symptoms."

FPC utilizes a computerized medical records system known as the Composite Health Care System ("CHCS"). Under CHCS, a physician may log into his computer directly and enter an order to be carried out by other departments. Thus, a physician may enter an electronic order referring a patient for lab or radiology work, which may include x-rays, ultrasounds, MRIs, CT scans, or any number of other exams. The order is sent automatically to and carried out by the proper department. If the receiving department is unable to carry out the order (for example, if there is a scheduling conflict), the patient is referred to Tricare --- a Defense Department health benefit option program utilizing private physicians and facilities --- or the patient is sent back to the doctor. There is no third option.

In this case, Dr. Shutt referred Henson for an ultrasound by entering the order into CHCS, and Henson went immediately to the radiology department to schedule the exam. While in the radiology department, she was informed that there were no appointments available within the next two weeks. The order was then "cancelled" with FPC, and Henson was "referred downtown" and told to schedule the ultrasound with a private provider through Tricare.[4]

Henson testified that she did not schedule the ultrasound through Tricare because she could not afford the deductible. She claims that she told this to an unknown radiology attendant --- a tall, slender man with a "triangle face" and thinning hair --- and he purportedly told her that she would be put on a waiting list and that Eglin would contact her when they had an opening in the new calendar. She was allegedly told that this could take up to two months which, obviously, would have been well outside the two-week period contemplated by Dr. Shutt. But, the radiology department at FPC does not have a "waiting list" and simply does not even do what Henson outlined. Based on the other testimony in the case, including but not limited to that of Tsgt. Donald Jackson, I do not find her testimony credible. For whatever reason, Henson did not schedule or undergo the ultrasound as ordered by Dr. Shutt.[5]

---

[4]There were numerous questions in the trial and deposition testimony of who "cancelled" the ultrasound and whether Dr. Shutt was, or should have been, notified of the cancellation. To say that the ultrasound was "cancelled" is somewhat a misnomer. The ultrasound was not cancelled, but rather, as noted, Henson was referred out and told to schedule the exam with a private provider through Tricare. This procedure is common and was entirely appropriate, even though Dr. Shutt was apparently not told that the ultrasound had been referred to Tricare.

[5]Henson attempted to justify and explain why she did not schedule the ultrasound through Tricare: "At that time I had some very pressing personal matters that had just occupied my time and my mental attention." By this, she was referring to her general mental condition and major child custody problems with her

Months after Dr. Shutt referred Henson for an ultrasound and advised her to "follow-up in the meantime for new or worsening symptoms," she returned to FPC with other complaints. First, on July 6, 2001, she sought treatment for an ear ache and neck pain. She was treated by Dr. Tammy J. Lindsay. Then, on August 31, 2001, she returned with complaints of an ankle sprain and continued ear pain, and she was treated by Dr. Sarah O. Fortuna. At no point during either visit did Henson make any breast complaint, or ask or mention anything about the ultrasound that Dr. Shutt had ordered for her. There is no indication that Drs. Lindsay or Fortuna knew anything about her prior breast complaints.[6]

Henson also reported to the Pensacola Veterans Affairs Clinic ("VA Clinic"), on December 13, 2001, for a complete and exhaustive "health maintenance visit," but there was again no mention of any breast-related complaints, symptoms, or treatment. The absence of any breast complaint with the VA Clinic is significant given that the screening history covered an impressively broad spectrum of health maintenance issues, all the way down to the importance of wearing seat belts while in vehicles. And, again, on May 15-16, 2002, Henson returned to the VA Clinic for a medical disability exam, during which she complained of, *inter alia*, headaches and "an occasional urinary tract infection," but there was still no mention of any breast problem.

---

ex-husband, which will be discussed *infra*.

[6]Henson claims that Drs. Lindsay and/or Fortuna should have known of her breast complaints because she "believes" that they may have "thumbed through" her chart. This speculative belief is insufficient to establish that these doctors knew of the prior breast complaint. Further, the most reasonable inference for them to draw was that Henson's prior breast complaint had been resolved satisfactorily. And even if they did know that the ultrasound had not been done and that the breast complaint was unresolved, a physician is not necessarily obligated to ask about a prior complaint when a patient later presents with completely unrelated ailments.

On June 12, 2002 --- that is, fifteen months after she saw Dr. Applegate, and thirteen months after Dr. Shutt ordered the ultrasound --- Henson once again returned to the VA Clinic for what she described as a "head to toe" medical disability exam. At the end of this examination, and it appears to have been somewhat an afterthought, she told the physician, Dr. Yolanda Ramos, that she had a "lump in right breast since a year ago." She stated the mass had "doubled in size" over the past year. Dr. Ramos noted a "palpable mass (roughly measuring 4-5 cm in diameter)" in the upper aspect of the right breast. Dr. Ramos immediately ordered a mammogram which Henson was able to have done the same day at Dr. Angel Williamson's diagnostic facility. An ultrasound was also performed at the same time as the mammogram. The diagnostic reports revealed a 2 cm mass requiring a biopsy. The subsequent biopsy revealed the mass to be cancerous, and the specimen was later showed to be a T2N0M0 cancer, Stage IIA, histological grade III, and lobular in type with some ductal carcinoma in situ.

Henson underwent a right mastectomy with lymph node dissection on July 18, 2002, and the pathology report showed no residual tumor in the breast specimen and no lymph node involvement. Because of her age and family history, and because of the size and depth of the mass, it was recommended that she also undergo radiation and chemotherapy. Although she agreed to this recommendation, Henson was at times non-compliant with her treatment. Her oncologist, Dr. Robert Prieto, threatened to, and did, call the police to retrieve her for one of her chemotherapy appointments.[7] At some point during this period, Dr. Prieto discussed with Henson the positive result of her BRCA-1 test (an inherited gene mutation that makes breast and ovarian cancer a higher likelihood among those

---

[7]Dr. Prieto also testified during deposition that he told Henson to follow-up with him within six months after her last treatment, but she had not done so at the time of his deposition. And there are numerous other examples in the record of Henson being non-compliant with her medical directives.

who are positive), and the aggressive cellular structure of her cancer, which combined are indicative of a high likelihood of the cancer reoccurring in other parts of the body. He recommended that she consider having additional precautionary surgeries. Henson thereafter underwent lymph node removal, a left mastectomy (even though there was no finding, or suggestion, of cancer in the left breast), and an ovariectomy, the latter of which was due, at least in part, to unrelated female problems. All of these procedures were prophylactic and dictated by conventional medical wisdom. Following her chemotherapy and radiation, she also had numerous breast reconstructive surgeries, but with respect to her right breast, they were only partially successful, painful, and complicated by the radiated breast tissue. Fortunately, however, Henson is now cancer-free and her prognosis is good.

## II.    CONCLUSIONS OF LAW

Henson has filed a five-count complaint in this case. Many of the counts are not substantive claims, but rather they go to the issue of damages. For example, count III is described as "fear of cancer recurrence and death," while count V is described as "loss of wages and of future earning capacity." Ultimately, the complaint indicates that Henson is advancing a single claim of medical malpractice, *viz*, the allegedly negligent failure to timely diagnose and treat her breast cancer "by United States of America or Eglin Air Force Base employee [*sic*] Doctors Applegate and Shutt."

The parties agree that Florida substantive law governs this case. To prevail in a medical negligence action under Florida law, "a plaintiff must identify the standard of care owed by the physician, produce evidence that the physician breached the duty to render medical care in accordance with the requisite standard of care, and establish that the breach proximately caused the injury alleged." Torres v. Sullivan, 903 So.2d 1064, 1067 (Fla. 2d DCA 2005); accord Wale v. Barnes, 278 So.2d 601, 603 (Fla. 1973). It is undisputed that Drs. Applegate and Shutt

owed Henson a duty (*i.e.*, a standard of care), and that "[t]he prevailing professional standard of care for a given health care provider shall be that level of care, skill, and treatment which, in light of all relevant surrounding circumstances, is recognized as acceptable and appropriate by reasonably prudent similar health care providers." Fla. Stat. § 766.102. The question to be resolved in this case is whether there was a breach of that duty and, if so, whether the breach caused the complained-of injuries.

## A. Breach of the Duty of Care

Henson has advanced three, somewhat overlapping theories of how Drs. Applegate and Shutt breached the prevailing standard of care in their treatment of her breast complaints. First, she claims that when she presented to Dr. Applegate she should have been immediately referred for diagnostic testing. Next, she contends that when Dr. Shutt subsequently referred her to an ultrasound, he ordered the wrong test because a mammogram would have been more appropriate. And thirdly, she contends that, in any event, Drs. Applegate and Shutt (and presumably Drs. Lindsay and Fortuna) should have followed-up to confirm that she underwent the ultrasound exam and to verify that she no longer had breast complaints. In addressing these three claims below, I will rely in part, where noted, on the opinions rendered by Dr. Rodney C. Dwyer, a Board Certified Surgeon who testified on behalf of the defendant United States. Dr. Dwyer is well qualified to testify regarding both the diagnosis and treatment of breast cancer, and I found him to be knowledgeable and credible.

### *(i) Dr. Applegate's Treatment*

Henson argues that Dr. Applegate should have made a differential diagnosis of breast cancer and immediately referred her for diagnostic testing when she first presented. In making this argument, she compares the treatment that she received at FPC with the VA Clinic. She points out that the VA Clinic immediately ordered

diagnostic testing when she presented Dr. Ramos with her breast complaint in June 2002, while Dr. Applegate merely (and incorrectly) diagnosed a ligamentous stretch or strain and recommended a better support garment. There are, however, several important distinctions that must be drawn between her visit to the VA Clinic in June 2002, and her initial visit to FPC in March 2001.

When Henson first saw Dr. Applegate and complained of a breast lump on March 6, 2001, she told him that she noticed the lump only four days prior, on March 2, 2001. The lump was undetectable by physical examination; only an area of "tenderness." Likewise, eight weeks later, Dr. Shutt was also unable to find any clear mass (but only a firm area) during his physical examination. Henson had recently stopped nursing and was concerned that the newly-discovered mass may have been related to a clogged milk duct. She was also about to begin her menstrual cycle, and it was believed that the pain may have been related to that cycle. When Henson went to Dr. Ramos, by contrast, she reported that she had the lump for over a year, during which she watched it harden and "double in size." And most significantly, the mass was clearly tangible and "palpable" at that point in time. It is not at all surprising, under the scenario presented to Dr. Ramos, that Henson was immediately referred for diagnostic testing. That does not necessarily suggest that Dr. Applegate should have done the same back in March 2001.

Henson was eventually diagnosed with a lobular carcinoma, which Dr. Dwyer explained is an uncommon form of cancer that is difficult to diagnose because it is more diffuse, as opposed to a discrete legion. During his examination, Dr. Applegate elicited the family history of breast cancer. He conducted a physical examination, but did not feel any lump or mass. Dr. Applegate diagnosed a tenderness in the upper breast and gave a working diagnosis of, and recommended treatment for, a ligamentous stretch or strain. He concluded his examination by noting that the treatment plan would be reviewed, and an ultrasound would be

ordered, if the symptoms did not abate within two weeks. Henson did not return to FPC until almost eight weeks later. Dr. Dwyer testified that two weeks would not have made "any difference" whatsoever if the complaint turned out to be something serious, *i.e.*, cancer. Dr. Dwyer further testified that given her young age, history, complaint, size and character of her breasts, and the absence of an observable mass upon examination, Dr. Applegate's treatment was reasonable and in keeping with the prevailing professional standard of care. I agree with, and accept, this opinion.[8]

### (ii) Wrong Diagnostic Test

Henson next argues that on her second visit to FPC, it fell below the applicable standard of care for Dr. Shutt to refer her to an ultrasound. She contends that a mammogram would have been the more appropriate test. This argument fails for two principal reasons.

First, all the witnesses in this case agree that an ultrasound is a reasonable and well accepted diagnostic tool to detect breast cancer. In fact, under common circumstances, it is the preferred initial test. This is particularly so, as here, when dealing with younger patients with dense breasts. Dr. Applegate testified that:

> A mammogram is not recommended typically for
> [Henson's] age group because the most common finding
> is going to be a cyst, and what the ultrasound will do is
> two things. Number one, it will tell you if there's
> something there that should not be there. Number two, it

---

[8]Henson's oncologist, Dr. Prieto, was asked during his deposition what he was "taught in med school" to do when a 33 year old woman presents with a lump in her breast and a family history of breast cancer. He stated that the recommendation would be to reexamine the breast "two to four weeks later" to evaluate any potential "changes in the mass," and then refer the patient for diagnostic testing or surgical consultation. This is precisely what would have happened had Henson returned to Eglin within two weeks as was recommended. This procedure was followed by Dr. Shutt when she was reexamined and referred for testing (ultrasound) after she did return, almost eight weeks later.

tells you if it's a solid mass or if it's a cystic mass. And the mammogram is not able to distinguish the solid from a cyst, and that's why in this particular instance the ultrasound is done first rather than a mammogram.

Similarly, Dr. Shutt testified during deposition that:

Well, commonly in a young person such as [Henson] that's under 40, it's difficult on a mammogram to be able to interpret it because patients at that age tend to have dense breasts, and the ultrasound would be the test of choice in a patient that age.

\* \* \*

[An ultrasound] is quite good at evaluating breast masses in very thick breasts where the mammography may not be able to detect it.

Dr. Prieto opined that it was "reasonable" and "sound diagnostic procedure" for Henson to be referred for an ultrasound because, *inter alia*:

[T]here's limitations [*sic*] to the mammography in a young patient. Especially one with dense breast tissue, the mammogram may be very difficult to interpret for one and/or it may not provide any information because there's so much shadowing that the radiologist can really not say much at all about that patient's mammogram.

\* \* \*

[A] mammogram in a young patient can be very, very difficult to interpret and so --- and then the other --- it's very difficult to interpret a dense tissue. The other thing is that lobular carcinoma, whether actual cancer or carcinoma in-situ, can sometimes appear very silent to mammogram also.

\* \* \*

So when you combine this appearance of normal fibrous dense breast tissue in a lady of the age of 33 or 34 years old . . . mammography might not be diagnostically effective.

Dr. Dwyer testified that because of the density and fibrous appearance of breast tissue in younger women, ultrasound should be "the first test of choice." He testified that with mammograms "the false negative ratio goes up significantly in younger women with denser breasts" and, consistent with Dr. Applegate's testimony, he stated that mammography does not show the difference between solid and cystic lesions very well. Even Henson's own expert witness, Dr. Samuel J. Williams, acknowledged that mammography is generally "more unreliable and more difficult as a screening tool in women with large dense fibrocystic breasts."

That is not to say, however, that a mammogram is ineffective as a diagnostic tool. To the contrary, all the witnesses seem to agree that it is a wise course of treatment to use mammograms *in conjunction* with ultrasounds. Henson's expert witness, Dr. Williams, stated repeatedly throughout his deposition that mammograms and ultrasounds are each useful diagnostic tools and should be used in tandem as they are "complimentary studies." Indeed, in his affidavit that was attached to Henson's complaint, he concluded that Henson "required referral for [both] an ultrasound and a mammogram." And this view was apparently shared by Dr. Angel Williamson's diagnostic facility because it had Henson undergo an ultrasound at the same time as her mammogram. While there may be different schools of thought on which test should come first (Henson, of course, argues that it should be mammogram), the end result is ultimately the same. Inasmuch as it is undisputed that an ultrasound should generally be done *along with* a mammogram, I conclude that an ultrasound, as ordered by Dr. Shutt, is a common, reasonable, and acceptable diagnostic tool for the detection and diagnosis of breast cancer, particularly with respect to a young patient with large dense fibrocystic breasts.

But secondly, even if I were to agree that Dr. Shutt ordered the wrong test (or that he ordered it in the wrong sequence), Henson's claim misses the mark for still another important reason: the point is moot because she never underwent the

ultrasound in the first place. She *might* have a claim if she underwent the ultrasound and the cancer was left undetected because no follow-up test was used. That is not the situation here, however. Henson was referred to the ultrasound, but she never had it done. Dr. Shutt noted in his chart --- and testified that he had a "distinct recollection" of telling Henson --- that he planned to refer her for a surgical consultation if there were abnormalities on the ultrasound. Henson's expert witness, Dr. Williams, agrees that Dr. Shutt's planned treatment in this respect was "appropriate." If abnormalities were (or were not) found, Dr. Shutt indicated in his chart that "the results will be discussed with the patient and a decision will be made on where to go from here." Most significantly, Dr. Shutt testified (and I find his testimony credible) that even if the ultrasound had been normal, he would have probably sent Henson for a mammogram or surgical consultation anyway because that is how he typically handles "situations like that." I agree with Dr. Dwyer, who has concluded that this would have been a reasonable sequence and course of treatment. Of course, that did not happen because Henson did not undergo the ultrasound as directed.

In sum, it did not fall below the prevailing standard of professional care for Dr. Shutt to order Henson to undergo an ultrasound. I find that an ultrasound would have been an equally effective (if not better) diagnostic tool on the facts of this particular case. Moreover, even if it is assumed that a mammogram would have been the better test and that it should have been ordered, Dr. Shutt clearly did not breach the prevailing standard of professional care because he would have referred Henson for a mammogram and/or other follow-up if she had first shown up for the ultrasound.

### *(iii) Failure to Follow-up*

And lastly, Henson argues that the physicians at FPC were negligent in not verifying that she underwent the ultrasound and/or not following up to see if she

still had breast complaints.

Apart from the testimony of Dr. Williams, whose opinion in this context is simply not credible and which I do not accept, all the witnesses agree that a physician does not have the duty to verify that a patient is fully compliant with treatment. That would be an enormous and virtually impossible burden to ask physicians to shoulder. It is unreasonable to expect that physicians check the status of all ordered tests and treatment plans to ensure patient compliance. Rather, it is reasonable to expect that patients will act responsibly and either comply with or to tell the physician that they cannot, or will not, follow the proposed treatment plan.[9]

Similarly, it is not reasonable to expect or require physicians to inquire about prior complaints when patients later present with completely unrelated problems. The prevailing standard of care does not mandate that a physician ask if a former complaint has been resolved when a patient seeks subsequent treatment, particularly when that patient is advised to (but does not) return if the symptoms persist.

Henson was referred for an ultrasound to be done within two weeks. FPC was unable to meet that order, so she was told to go through a private provider. She chose not to do so. She was also told to return if the problem did not abate. She returned to Eglin for medical treatment two times thereafter (for an ear infection, neck pain, and an ankle sprain), but she did not mention the ultrasound or make breast complaints of any kind. Nor did she say anything about the ultrasound or make breast complaints during her two later visits to the VA Clinic. If she had,

---

[9]Even Henson's other expert witness, Dr. Steven Doheny, testified at trial that a physician *does not* have the duty to verify or force compliance with treatment because mentally competent patients "have a right to accept or reject any medical advice or treatment or test." To the extent that Henson argues that she was not mentally competent, this issue will be discussed *infra*.

Case No. 3:04cv85/RV/MD

the treating physicians would have most likely noted that the ultrasound was outstanding and followed-up with another breast exam. Dr. Applegate explained that the physicians at Eglin see patients every fifteen minutes, so, necessarily, that means that they only have fifteen minutes to spend with each patient. Dr. Dwyer testified, and I agree, that it is unreasonable to require a physician in that situation to review a patient's full history (which can sometimes be several inches thick) and inquire about a prior complaint or pending test when she is presenting with an unrelated ailment.

Henson attempts to avoid responsibility by suggesting that Drs. Applegate and Shutt should have followed-up because they knew that she might have compliance problems due to her prior mental health issues. But, I find that there is no evidence that her treating physicians knew, or reasonably should have known, that her mental health history might render her non-compliant. For example, the "Summary of Care" chart that Dr. Applegate worked off indicated that Henson had a history of depression. It also indicated that she had a history of "thrombos." Dr. Applegate explained at deposition that having a "history" of a particular condition "means that it was in the past but not currently an active problem. Just like you see underneath it [on the chart] where it says history of thrombos, which is a quad, in the right calf, when it says history of, that means it's in the past, and not currently an active problem." Henson never complained to Drs. Applegate or Shutt about any depressive or mental health symptoms, and it is unclear if she even had such symptoms at that particular point in time. Indeed, it is noteworthy that her mental condition during this period was apparently not so severe as to prevent her from seeking treatment for other medical problems, such as an ear ache and neck pain. But, in any event, it is not reasonable to expect the physicians at FPC to have reviewed Henson's several-inches thick medical and psychiatric files during her fifteen minute office visit to ensure that her mental problems from years prior

would not impede compliance.[10]

Henson also testified that she did not return to FPC with breast complaints or discuss the outstanding ultrasound because she had "pressing personal matters." Specifically, she argues that she was involved in a custody battle with her ex-husband that began when he "kidnapped" their children in September 2001, and he kept them through late 2002. But, this custody situation did not arise until several months *after* she was ordered to undergo the ultrasound, and thus it does not excuse or explain why she ignored the order and did not return with breast complaints. Moreover, while the problem was obviously upsetting and difficult for Henson, this personal issue was unknown to FPC. And even if it was known, it is unclear whether and to what extent that would have impacted the duty of care that was owed to her. Family problems notwithstanding, Henson was still responsible for complying with the treatment plan that was ordered for her. That responsibility is not shifted to FPC merely because she found herself in the not-so-unusual position of having problems in her personal life.[11]

## B. Causation

Although Henson has failed to establish any breach in the standard of care, this case also fails for lack of causation. In Florida, courts follow the "more likely than not" standard of causation and require proof that the negligence probably caused the plaintiff's injuries. Gooding v. University Hosp. Bldg., Inc., 445 So.2d 1015, 1018 (Fla. 1984). Henson argues, through the deposition testimony of Dr.

---

[10]I note that Henson's psychiatric and medical files are kept separately (for privacy reasons) by Air Force Medical. Accordingly, there is no evidence that Drs. Applegate and Shutt even saw them.

[11]Even though Henson was having these custody problems in late 2001 through late 2002, she was able to report to the VA Clinic on two occasions during this period, in December 2001 and May 2002, but she did not mention the ultrasound or report any breast complaints whatsoever.

Williams, that if Drs. Applegate and Shutt had properly diagnosed her breast cancer in 2001, then she could have had a lumpectomy, which, in turn, would have avoided most if not all of the subsequent surgeries and treatment. This claim is just not consistent with, or supported by, the other testimony and conventional medical procedure. Dr. Dwyer has concluded, and I agree, that:

> Ms. Henson inherited the BRCA-1 mutation in her genetic makeup which means she was and is much more likely than the average to develop breast and other cancers. ***Any notion that a delay in diagnosis caused her to have "unnecessary surgery" is incorrect, no matter whom or what caused the delay.*** The prophylactic mastecomy, hysterectomy, bilateral salpingoophorectomy were done because of her BRCA-1 inheritance. Staging procedures for ovarian cancer, done during the oophorectomies were for the outside chance that an occult ovarian cancer might have been found on the pathologic tissue examination after the surgery. (No such occult lesion was found). She did not, and does not, show any sign of spread of her cancer. The incidental partial vulvectomy was for an unrelated problem, performed only for the convenience of the patient and the fact that it could be accomplished at the same time with little risk and negligible increase in the morbidity of the procedure. (Emphasis added).

Given her positive family history, BRCA-1 classification, and the aggressive nature of her cancer, Henson was in an extremely high risk category. I conclude that the additional prophylactic procedures (along with chemotherapy and radiation) would have been medically advised, even if the original diagnosis had not been delayed. This conclusion is perhaps best indicated by the fact that she also underwent a left mastectomy, even though there was no indication that the cancer had spread to that breast. Henson has not, therefore, shown that it is "more likely than not" that the delay "probably" caused her injuries. The alleged negligence of Drs. Applegate and Shutt is not causally related to the surgeries and treatments of which she

complains.

### III.	CONCLUSION

I find that Henson's own behavior with respect to her treatment is the reason for the delay in diagnosis of her breast cancer, even though that delay did not cause her any additional injury. She saw Drs. Applegate and Shutt each in one clinical encounter early in the history of what months later proved to be breast cancer. Each doctor noted her genetic heritage, and each followed the proper standard of care in dealing with her condition. She did not follow their advice in that she did not get a critical test that had been ordered by Dr. Shutt, and she did not return to his care "for new or worsening symptoms." In fact, she did not seek care from anyone for more than a year regarding her breast complaint, during which time she reportedly watched a lump in her breast harden and double in size, while, at the same time, presenting with a variety of lesser complaints to various practitioners, none of whom knew of her breast problem. Fortunately, she has received good medical care and is now cancer-free. For that, she should be very grateful.

For the foregoing reasons, the Clerk shall enter judgment in favor of the United States and against the plaintiff.

DONE AND ORDERED this 11th day of May, 2007.

*/s/Roger Vinson*
**ROGER VINSON**
**Senior United States District Judge**